C7I8GOLC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   GOLDMAN SACHS & CO.,

4                Plaintiff,

5         v.                              12 Cv. 4558 (RJS)

6   GOLDEN EMPIRE SCHOOLS FINANCING
    AUTHORITY,
7
                 Defendant.
8
    ------------------------------x
9
                                         July 18, 2012
10                                       4:05 p.m.

11  Before:

12                  HON. RICHARD J. SULLIVAN

13                                       District Judge

14                         APPEARANCES

15  SULLIVAN & CROMWELL, LLP
         Attorneys for Plaintiff
16  BY:  MATTHEW A. SCHWARTZ
         DAVID H. BRAFF
17
    FISHMAN HAYGOOD PHELPS WALMSLEY WILLIS & SWANSON, LLP
18       Attorneys for Defendant
    BY:  JAMES R. SWANSON
19
    KENNEDY & MADONNA, LLP
20       Attorneys for Defendant
    BY:  KEVIN J. MADONNA
21

22

23

24

25

C7I8GOLC

1          (Case called)

2          THE DEPUTY CLERK:  For the plaintiff.

3          MR. SCHWARTZ:  Good afternoon, your Honor.  Matthew

4   Schwartz, from Sullivan & Cromwell, for the plaintiff, Goldman

5   Sachs & Co.

6          THE COURT:  Good afternoon.

7          MR. BRAFF:  David Braff, Sullivan & Cromwell.

8          THE COURT:  Mr. Braff, good afternoon.

9          For the defendants.

10         MR. SWANSON:  Jim Swanson from New Orleans on behalf

11  of the defendants.

12         THE COURT:  Good afternoon, Mr. Swanson.

13         MR. MADONNA:  Good afternoon, your Honor.  Kevin

14  Madonna, from Kennedy & Madonna, for defendants.

15         THE COURT:  Mr. Madonna, good afternoon to you.

16         We are here in connection with the premotion

17  letters -- I guess this is a preliminary injunction motion.  I

18  have the letters from the parties that relates to the issues

19  here.

20         I want to make sure I understand the broker-dealer

21  agreement.  There is a broker-dealer agreement which is signed

22  by Goldman and Golden Empire, correct?

23         MR. SCHWARTZ:  That's correct.

24         THE COURT:  And there is a provision of that agreement

25  5.9, which talks about governing law jurisdiction, waiver of

C7I8GOLC

1    trial by jury.  5.9 on page 11.

2            I know the argument of the defendants is that this

3    doesn't really apply to the ARS transactions.  That's your

4    argument?  I am not sure who is going to carry the ball here.

5            Mr. Swanson.

6            MR. SWANSON:  I think our argument is really two-fold.

7    The first is that the provision in the broker-dealer agreement

8    is self-referential.  It refers to the disputes arising out of

9    the broker-dealer agreement and transactions contemplated

10   thereby or hereof or hereby.  And there is a definition in the

11   agreement of what hereby means, and hereby means the auction

12   transactions that are the transactions that are going to occur

13   subsequent to the broker-dealer agreement.  Most of what we are

14   complaining about in our statement of claim in the arbitration

15   doesn't relate to that at all.  It relates to things that

16   happened during the underwriting of the ARS issuance.

17           THE COURT:  Which is when in relation to this

18   agreement?

19           MR. SWANSON:  I'm sorry?

20           THE COURT:  When is that in relation to this

21   agreement, before or after?

22           MR. SWANSON:  That was before this agreement was

23   executed.  The activities we are complaining about led up to

24   the signing of the agreements that consummated this

25   transaction.

C7I8GOLC

1          THE COURT:  Walk me through the chronology.

2          MR. SWANSON:  I don't know off the top of my head the

3    exact dates of the signing of these agreements, but it's very

4    typical that there is a two or three month lead-up period where

5    the transaction is structured, the ARS transaction is

6    structured.  It was in that connection that we were working

7    with Goldman Sachs.  They were helping us structure the

8    financing.  And the structure would include the underwriting of

9    the bonds and then the broker-dealer agreement.  And it would

10   be typical -- I don't know how it was done here -- the

11   broker-dealer agreement and the underwriting agreement would be

12   signed at or near the same time.

13         THE COURT:  I am just looking at the agreement and it

14   talks about, whereas, the issuer is issuing $10 million,

15   aggregate principal amount of its 2007 adjustable rate security

16   bonds.  I am trying to figure out what this broker-dealer

17   agreement deals with if not these ARSs and the acquisition of

18   them.

19         MR. SWANSON:  The way that the transaction is

20   structured I think is that there are bonds that are sold, and

21   those are sold by Golden Empire to Goldman Sachs pursuant to

22   the underwriting agreement, the bond purchase agreement.

23         THE COURT:  When is that agreement?

24         MR. SWANSON:  That agreement is going to be sometime

25   contemporaneous with the broker-dealer agreement, but it

C7I8GOLC

1    pertains to a different subject matter.  It pertains to the

2    sale of the underlying bonds.  What the broker-dealer agreement

3    covers is the actions that Goldman Sachs is going to take as

4    broker-dealer in connection with the auctions that occur after

5    the issuance.  So there are periodic auctions and that

6    agreement governs what Goldman Sachs is supposed to do for us

7    in connection with those auctions.  I don't know if you follow

8    that, your Honor.

9         THE COURT:  I follow that.  I am just looking to see

10   that in the language of the broker-dealer agreement.  Is there

11   another agreement that deals with the bonds themselves?

12        MR. SWANSON:  The bond purchase agreement.

13        THE COURT:  Do I have that one?

14        MR. SWANSON:  I don't know if you have it.  I would

15   think it would be attached to the letters.  I do not know

16   whether that was provided to you.  Certainly, in connection

17   with the motion we would attach and append that, yes.

18        THE COURT:  It's an appendix to --

19        MR. SCHWARTZ:  To the complaint, your Honor.

20        THE COURT:  I am going to print that out.  That's

21   probably where we ought to start, what does the broker-dealer

22   agreement cover and what does it not cover?  Your view is it

23   doesn't cover the acquisition of the bonds themselves, right?

24        MR. SWANSON:  The original issuance and acquisition of

25   the bonds, it does not cover that.  It covers what is going to

C7I8GOLC

1  happen with respect to the periodic auctions of the auction

2  rate securities after they are issued.

3          THE COURT:  Mr. Schwartz, you agree or disagree with

4  that?

5          MR. SCHWARTZ:  We disagree with that.  I think for a

6  few reasons, it's very hard to separate out the issuance of the

7  bond purchase agreement from the terms of the broker-dealer

8  agreement.

9          First, as I think we pointed out in our letter, it is

10  a very broad merger clause in the broker-dealer agreement.  It

11  says the broker-dealer agreement and the other agreements and

12  instruments executed and delivered in connection with the

13  issuance of the ARS contain the entire agreement between the

14  parties related to the subject matter hereof.

15          THE COURT:  But 5.9 just says the broker-dealer

16  agreement shall be governed according to the laws of New York.

17  The other document language is not in 5.9, is it?

18          MR. SCHWARTZ:  That's right.  But in terms of looking

19  at these agreements separately or together, it's very clear

20  from the language of the agreement that they are contemplated

21  as a contemporaneous transaction.  As counsel said, these were

22  executed contemporaneously and the entire transaction is

23  obviously one where Goldman Sachs purchases the bonds from the

24  issuer and then acts as the broker-dealer to the issuer.

25          THE COURT:  But if the broker-dealer agreement has a

C7I8GOLC

```
1    clause that talks about governing law and it only refers to the

2    broker-dealer agreement, and there is a separate agreement

3    relating to the ARSs -- do I call them that?

4              MR. SCHWARTZ:  That's correct.

5              THE COURT:  The plural of ARS.

6              -- themselves, and that document doesn't have a

7    governing law jurisdiction and waiver of trial by jury section,

8    doesn't that suggest that it's not covered by the broker-dealer

9    agreement?

10             MR. SCHWARTZ:  We don't think so, your Honor.  We

11   think under the New York case law that you have to look at the

12   contemporaneous executed agreements, you look at them

13   holistically.  That's the first thing.

14             The second thing, as counsel said, he said most of our

15   claims arise out of the bond purchase agreement.  That clearly

16   suggests, and we think, frankly, most of this case relates to

17   the actions of Goldman Sachs' broker-dealer, but that shows

18   that counsel is conceding that at least a large part of his

19   claims in front of FINRA are arising out of actions that are

20   governed by the broker-dealer agreement.  And we really don't

21   see how, with an exclusive forum selection clause saying that

22   any claims arising out of the broker-dealer agreement, which

23   counsel is effectively conceding are in front of FINRA right

24   now, how those can proceed in front of FINRA as opposed to this

25   court with a clear clause like that?
```

C7I8GOLC

1          THE COURT:  Why not have an express reference to FINRA

2     and the fact that the parties have agreed that they are not

3     going to have arbitration before FINRA?  It could be that,

4     right?  Sometimes agreements say that.

5          MR. SCHWARTZ:  That could be done, your Honor, but we

6     don't think that's the standard under the Second Circuit case

7     law, under the cases decided by districts in this circuit.  We

8     have had cases, such as the *Applied Energetics* case, the

9     *Anderson* case, and the *Biremis* case, all dealing with exclusive

10    forum selection clauses, that seem provide, as here, that any

11    actions arising from those agreements need to be brought in

12    federal court and not explicitly stating that they are not

13    going to be done in front of FINRA.

14          So the standard has not been an ironclad statement

15    that we are not going to do it in front of FINRA, we are going

16    to do it in federal court, but simply and logically, if you say

17    you're going to bring something in front of federal court, it

18    means that you are not going to be bringing it in front of

19    FINRA.

20          THE COURT:  *Applied Energetics* and the *Bank of Julius*

21    case have different language than here so each requires a

22    certain parsing of the language.

23          It just is surprising to me that an entity that is

24    sort of a member of FINRA, has agreed they are going to be

25    bound by FINRA rules, including arbitration requirements as a

C7I8GOLC

1   FINRA member, can be so easily overridden and nobody thinks

2   they need to make any reference to the FINRA rules.

3       MR. SCHWARTZ:  Your Honor, I grant that belt and

4   suspenders were not used in this exclusive forum selection

5   clause, but again, the cases that have ruled on this -- and I

6   can go through the actual clauses that were at issue both in

7   the cases that we cited in our letter and that the defendants

8   cited in their letter.  The cases that we rely on are very

9   clear, both from the Second Circuit and from the Eastern

10  District, with clauses and postures almost identical to here,

11  that if you say that the actions arising out of the agreements

12  are exclusively to be brought in federal court, that is

13  sufficient to make crystal-clear to everybody that they are not

14  allowed to be brought in front of FINRA.

15      If your Honor would like, I can go through a couple of

16  those cases for you.

17      THE COURT:  I have seen the language.  There is

18  different language.  *Applied Energetics* talks about

19  adjudicated, and the Second Circuit made a big deal about that

20  because that is an unmistakable reference to judicial action,

21  which distinguished it from the *Bank Julius* case which had

22  squishier language.

23      I don't know whether that's persuasive, but the

24  language here is different altogether.  Here adjudicated isn't

25  used at all.  It just talks about all actions and proceedings

C7I8GOLC

1  arising out of this broker-dealer agreement, or any of the

2  transactions contemplated hereby shall be brought in the U.S.

3  district court.

4       MR. SCHWARTZ:  That's correct.  Obviously, this court

5  does not do FINRA arbitrations, it only does litigations.  So I

6  don't see how somebody can read this provision as saying that

7  claims arising out of the broker-dealer agreements could be

8  brought in any forum other than this court.  Certainly, whether

9  the word adjudicated is there or not, it's crystal-clear that

10  FINRA arbitrations cannot be brought before your Honor.

11       THE COURT:  Mr. Swanson, what did your client think

12  this meant when they signed it?

13       MR. SWANSON:  I believe that the language in that

14  agreement says actions and proceedings.  So it doesn't

15  reference arbitration in any way, shape or form.  So when my

16  client was executing that document, they had absolutely no idea

17  that they would be waiving their right to arbitrate.

18       THE COURT:  What would be the reasonable construction

19  of this section that would not include the FINRA dispute that's

20  at issue here?

21       MR. SWANSON:  I think the reasonable construction of

22  that provision would be that it applies to the broker-dealer

23  agreement.  And if you look, it says hereof at the end of that

24  clause you read.  Hereof is a defined term in the broker-dealer

25  agreement that means the broker-dealer agreement, not all the

C7I8GOLC

 1    other agreements.  I think it's page 2 of the broker-dealer

 2    agreement you will see there is a defined term that says that.

 3              So we thought that we were --

 4              THE COURT:  What it says is, "The words herein,

 5    hereof, hereto and hereunder, and any other words of similar

 6    import, refer to this broker-dealer agreement as a whole and

 7    not to any particular section or other subdivisions."

 8              MR. SWANSON:  It didn't refer to the underwriting

 9    process and the bond purchase agreement is my point there.  And

10    the second thing that we --

11              THE COURT:  What is an example of something that would

12    be covered by this exception and a reasonable party signing

13    this agreement would think that they were getting without

14    waiving their FINRA dispute rights over disputes like this one?

15    What sort of an action or proceeding arising out of the

16    broker-dealer agreement would be contemplated by this?

17              MR. SWANSON:  Anything that arose out of the

18    broker-dealer agreement, such as there is a question of how

19    much the fee was that we owed, or whether they had undertaken

20    their responsibilities to locate bidders and submit bids, or if

21    they received bids and did not properly submit those bids to

22    the auction agent.  Those would all be covered by that clause

23    potentially.

24              Depending, of course, upon the meaning of actions and

25    proceedings.  And, your Honor, I think we are going to develop

C7I8GOLC

in the briefing an argument that under the New York law, and

under the definitions that are contained in New York statutes,

that actions and proceedings do not mean arbitration.  That is

not something we developed in our letter, but we do plan to

offer that argument in connection with the briefing of the

injunction.  That's something we have been developing in the

last couple of days.  And I think from the look of it, when I

was looking at it earlier today, it looked to be a fairly

strong argument in its own right.

     So we would say, at best, your Honor could say a

dispute that arises out of the broker-dealer agreement or the

transactions contemplated therein would have to be litigated.

But the cases say that when you look at this, you're looking

through the lens of -- the favored lens of arbitration, and if

there is any question, or if there is any ambiguity, or if

there is any uncertainty, you would have to arbitrate.  This

language is not clear and unequivocal because it contains the

words actions and proceedings and because it's not as broad to

cover all the agreements, it covers the broker-dealer

agreements.

     So, at worst, I would suggest, your Honor, that you

could enjoin Golden Empire from litigating disputes that arise

under the broker-dealer agreement, but not the disputes that

relate to the underwriting of these bonds, because those were

governed by the bond purchase agreement which has no such forum

C7I8GOLC

```
 1    provision in it.
 2                Those are the arguments that we plan to develop in the
 3    briefing in more detail.
 4                THE COURT:  My problem is I am not sure I fully see
 5    the difference between the two terms that you just described,
 6    what is under 5.9(a) and what is not under 5.9(a).
 7                We have got a July 11 bond purchase contract and that
 8    has a governing law section, but it doesn't have a choice of
 9    forum section.  It doesn't make any reference to arbitration
10    either, right?
11                MR. SWANSON:  That's correct.
12                THE COURT:  Then we have got a broker-dealer
13    agreement, which does it make any specific reference to this
14    July 11 document?  I don't think so, right?
15                MR. SWANSON:  I think it would be typical that the
16    whereas clause would refer to the transaction documents for the
17    entire transaction in the broker-dealer agreement.
18                THE COURT:  There is a whereas clause that refers to
19    the issuance of $10 million in ARSs, and then it also talks
20    about an indenture of trust dated July 1, but I don't think it
21    makes any reference to this July 11 agreement.  Am I wrong
22    about that?
23                MR. SCHWARTZ:  The merger clause is very clear that
24    the broker-dealer agreement and the other agreements and
25    instruments executed and delivered in connection with the
```

C7I8GOLC

 1    issuance of the ARS contain the entire agreement.

 2              THE COURT:  Where are you referring to?

 3              MR. SCHWARTZ:  That's in the merger clause.

 4              THE COURT:  What section?

 5              MR. SCHWARTZ:  I apologize.  Section 5.4, your Honor,

 6    on page 13.

 7              THE COURT:  On page 11, right?

 8              MR. SCHWARTZ:  It guess it depends on what year you're

 9    looking at.  Section 5.4.  I think it's the same section

10    throughout.

11              THE COURT:  So the broker-dealer agreement and the

12    other agreements and instruments executed and delivered in

13    connection with the issuance of the ARSs contain the entire

14    agreement between the parties relating to the subject matter

15    hereof.  There are no other representations, endorsements,

16    promises, agreements or understandings between the parties

17    relating to the subject matter hereof.  How does that lead to

18    the conclusion that 5.9(a) basically carries over a governing

19    law and jurisdiction provision that would apply into all of

20    these agreements that don't have that?

21              MR. SCHWARTZ:  I think there are two answers to that,

22    your Honor.  The first is, as we said before, you can even put

23    that question aside and simply look at the claims that they

24    brought here and see that their claims are based on both

25    Goldman Sachs' role as the underwriter and as the

C7I8GOLC

broker-dealer, and I think counsel has to concede that a
tremendous portion of their claims has to do with what Goldman
Sachs did in terms of submitting covered bids as a
broker-dealer.

THE COURT:  Do you agree with that, Mr. Swanson?

MR. SWANSON:  I agree that there are some claims that
do relate to that.

THE COURT:  You're prepared to back off of those in
the arbitration?

MR. SWANSON:  Yes.

THE COURT:  I guess it's worth knowing which ones
those are at some point, but keeping going.

MR. SCHWARTZ:  We would be interested in seeing that
because I think their claims are so intertwined with the
broker-dealer agreement that it would be pretty impossible for
them to do that, but we will see what counsel suggests.

As to the first part, which is the question that you
asked, to directly answer that, we think that under New York
law, when you look at a series of agreements that are executed
contemporaneously concerning the same transaction, and you have
a merger agreement there, that it's pretty clear that you are
supposed to look at them holistically.

Here what we have is an underwriter agreement that has
no forum selection clause, but a broker-dealer agreement that
has a very clear forum selection clause.  Regardless of whether

C7I8GOLC

 1    it says actions and proceedings, any actions and proceedings

 2    need to be brought before this court, and again, this court

 3    does not do FINRA arbitration, your Honor.  So we think if you

 4    look holistically at these documents and you look at their

 5    claims, it's very clear that those claims need to be brought

 6    here and cannot be brought in FINRA.

 7            THE COURT:  The presumption sort of runs in favor of

 8    arbitration.

 9            MR. SCHWARTZ:  I don't agree with that.  I think the

10    presumption runs in favor of the breadth of arbitration once

11    it's been established that arbitration has been agreed to.  But

12    there is no presumption in favor of arbitration and the court

13    needs to look at the documents to see whether or not

14    arbitration even has been agreed to in the first place without

15    using a presumption, and that's obviously something we would

16    develop in our briefs.

17            THE COURT:  What is going on with the arbitration now?

18            MR. SCHWARTZ:  Well, the arbitration has been stayed,

19    as we indicated in a footnote in our letter, and the agreement

20    between the parties is that it would be stayed pending this

21    Court's order on our motion for a preliminary injunction.

22    After that there is no agreement as to what would happen in the

23    arbitration.

24            THE COURT:  They filed the arbitration in February,

25    right?

C7I8GOLC

1            MR. SCHWARTZ:  That's correct.

2            THE COURT:  And you didn't file this action until late

3    June, right?

4            MR. SCHWARTZ:  That's correct, your Honor.

5            THE COURT:  June 11.  So four months.  What was going

6    on in the four-month period?

7            MR. SCHWARTZ:  There was problems with FINRA serving

8    us to begin with, and then in the interim, the only thing that

9    has been done is that we have filed a placeholder answer with

10   FINRA stating -- and I think this was attached to the

11   complaint -- stating, one, that we were going to be moving for

12   a preliminary injunction in front of this court, but, two, to

13   preserve our rights, we deny all the allegations in their

14   statement of claims for these few basic reasons.

15           So we haven't done any discovery.  I don't think there

16   has been a panel selected in that particular case.  It's really

17   just been the very bare bones basic stuff that Goldman Sachs

18   needed to do in order to preserve its rights in case your Honor

19   rules against us in the preliminary injunction.

20           THE COURT:  You agree with that, Mr. Swanson?

21           MR. SWANSON:  I do.

22           THE COURT:  I think it's an interesting issue.  I have

23   to say it's difficult for me to get my head around what exactly

24   is an action and proceeding arising out of this broker-dealer

25   agreement or any of the transactions contemplated hereby.  And

C7I8GOLC

1    I guess I want to see that developed with respect to what are

2    the claims in the FINRA arbitration and how each of them fits

3    or doesn't fit.  As Mr. Swanson seems to be conceding, some of

4    them don't fit or some of them do fit under this.  So I want to

5    figure out which are the close calls and which are the ones you

6    agree do arise out of the broker-dealer agreement and therefore

7    would not be subject to the FINRA arbitration.  It sounds like

8    you want to find that out too, Mr. Schwartz.

9         MR. SCHWARTZ:  I would be very interested to see how

10   they can disentangle their claims.  I don't think it's

11   possible, but we will take a look.

12        THE COURT:  Depending on how the disentangling

13   happens, it may make this more or less problematic to you,

14   right?  It couldn't be more.  I guess it could only be less.

15        MR. SCHWARTZ:  I think that's right, but I am highly

16   skeptical that they will be able to do that.

17        THE COURT:  Mr. Swanson, have you thought that through

18   at this point?

19        MR. SWANSON:  Not entirely, no, your Honor.  I think

20   the threshold issue is whether this clause is a waiver of our

21   right to arbitrate, and this is where I disagree with what

22   Mr. Schwartz just said.  There is a strong presumption against

23   finding a waiver of arbitration unless it is clear and

24   explicit, and I don't believe that this clause as a threshold

25   issue meets that.

C7I8GOLC

1          THE COURT:  I think the *Bank Julius* case does say

2     that.  I think the Second Circuit then seemed to backtrack a

3     bit with the later case *Applied Energetics* and some others.

4     Three decades or so passed in the interim, right?

5          MR. SCHWARTZ:  *Bank Julius* also had a nonexclusive

6     forum selection clause.  The word was "may," not "shall."  So

7     it's a very, very different case.  It's very distinguishable as

8     we will go through in our brief.

9          THE COURT:  The court in *Bank Julius* found a strong

10    presumption resolving doubts about the scope of arbitrable

11    issues in favor of arbitrability.  Do you agree with that?

12         MR. SCHWARTZ:  That is what they found.  Again, if you

13    look to more recent cases, in *Applied Energetics* and *Anderson*,

14    the Second Circuit is very clear that the type of exclusive

15    forum selection causes that we have in the broker-dealer

16    agreement -- again, let's put aside the issue about whether the

17    broker-dealer agreement applies to all the claims here -- that

18    the type of exclusive forum selection clauses that we have in

19    the broker-dealer agreement are clearly sufficient to override

20    the sort of default rule that you have that FINRA customer

21    arguments are resolvable in front of FINRA arbitration panels.

22         MR. SWANSON:  I just would say that I don't agree with

23    that.  The language in their cases that he is citing is

24    disputes.  They say any dispute.  This language is actions or

25    proceedings.  As you pointed out, it's all about parsing the

C7I8GOLC

1    language of this agreement.  And again, we will develop that in

2    our briefing as we go forward.

3           THE COURT:  I think the language and the gist of the

4    Second Circuit case law is that a forum selection clause has to

5    be pretty explicit in precluding an earlier agreement to

6    arbitrate.  I think they use the word positive assurance that

7    the dispute is not governed by the arbitration agreement.

8           I am not sure that this is as explicit or as clear as

9    it could have been or should have been if it was intended to

10   say under no circumstances are we ever going to FINRA with

11   disputes.

12          That's really your position, right, Mr. Schwartz?

13   There is virtually no dispute between these parties that is

14   going to be the subject of FINRA arbitration.

15          MR. SCHWARTZ:  That's correct.  And I think our

16   interpretation is very much in keeping with the *Anderson*,

17   *Applied Energetics* and the *Biremis* case, none of which said

18   explicitly that we are never going to be arbitrating in front

19   of FINRA.

20          THE COURT:  It might be worth advising Goldman in the

21   future it's a lot cheaper to just put the language in contracts

22   rather than lawyers spend half a day in court and for judges

23   and clerks to try and parse through the language.  Free advice.

24          MR. SCHWARTZ:  As your Honor knows, you always learn

25   things from litigation.  Otherwise we wouldn't be here if

C7I8GOLC

1   everything were belt and suspenders.  But we do think that

2   under the case law that this is pretty clear.

3          And just in response to Mr. Swanson's statement that

4   this says transactions and proceedings, again, I will reiterate

5   that --

6          THE COURT:  Actions and proceedings.

7          MR. SCHWARTZ:  Unless the court wants to change itself

8   and start to hold FINRA arbitrations, you cannot bring FINRA

9   arbitrations in front of the Southern District of New York, and

10  it's very clear that all actions and proceedings shall be

11  brought in front of the Southern District of New York.

12         THE COURT:  So the key phrase is, arising out of this

13  broker-dealer agreement or any of the transactions contemplated

14  hereby.  Where I am still fuzzy, and maybe it's just because I

15  don't understand these transactions and these arrangements as

16  well as you folks do, is what that means and what it doesn't

17  mean.  If it means, basically, any dispute between these

18  parties related to these bonds, then it seems to me there is an

19  easy way to say that.  I think it will be easier than what has

20  been said here.  It seems odd to me that just a few days before

21  this agreement was signed, the broker-dealer agreement, you

22  have got a bond purchase agreement that doesn't say anything of

23  the kind and just makes a reference that says that the bond

24  purchase contract shall be governed by the laws of the state.

25         There certainly is some confusion it seems to me as to

C7I8GOLC

1    what exactly the parties want when they have got documents

2    floating around over a one- or two-week period that have

3    different governing law sections, or each document has a

4    governing law section, but only one has an exclusive

5    jurisdiction section.

6           MR. SCHWARTZ:  With hope, our briefing can make it

7    clear to you that the claims that they have brought in their

8    statement of claims are completely intertwined with the

9    broker-dealer agreement, one.  So you wouldn't even have to

10   reach the issue about whether or not the broker-dealer

11   agreement's exclusive forum selection clause applies to the

12   underwriting agreement as well.  You can just say there is an

13   exclusive forum selection clause here.  These claims arise from

14   the broker-dealer agreement.  Regardless of whether these

15   claims arise from other agreements as well, they clearly arise

16   from the broker-dealer agreement, and we will have a

17   preliminary injunction.  Or, in the alternative, that our

18   arguments, looking at the New York case law and looking at the

19   way other cases have construed similar situations where you

20   have more than one agreement, and one agreement has a forum

21   selection clause and the other one doesn't, those cases look at

22   it holistically, and we hope that case law can be helpful to

23   your Honor as well.

24          THE COURT:  Obviously, we are just now going off of a

25   letter so this is not full briefing.  What did you have in mind

C7I8GOLC

1  for a briefing schedule?  Did you folks talk about that?

2          MR. SCHWARTZ:  We haven't.  We would be prepared to

3  move fairly quickly.  I would have said that we had been

4  prepared to move within the next day or so before this

5  conference, but I think we would like to take some of your

6  Honor's questions and comments into account and work on our

7  briefs a little bit, but I think that we could be ready in the

8  next week to two weeks to file something.

9          THE COURT:  That's fine with me.  Nothing is going to

10  happen until we resolve this, right?

11          MR. SCHWARTZ:  I think that's correct.

12          THE COURT:  Mr. Swanson, what were you thinking?

13          MR. SWANSON:  I think we would be in a position to

14  file our brief, if he is going to file next week, I think we

15  could file a week later.

16          THE COURT:  He said a week or two.  Are you fishing

17  for two?  It's all the same to me.  I am going to take a couple

18  of weeks in the beginning of August.  I will be working, but

19  you folks may also want to take some time.

20          MR. SCHWARTZ:  If it's all right, maybe what we should

21  do is confer with each other and submit a letter to the Court

22  or a proposed scheduling order to the Court.

23          THE COURT:  That's fine with me.  I assume that the

24  normal size brief will be more than sufficient to nail all this

25  down.  So let's presume that.  That's fine.  You want to get me

C7I8GOLC

1    a letter by Friday that tells me the proposed schedule?  And

2    then once I have that, I will either agree or not, and then I

3    will set a date for oral argument as well.

4              Anything else we should cover today?

5              MR. SCHWARTZ:  I don't think so.

6              THE COURT:  All right.  I look forward to being

7    educated on this transaction or these transactions and ARSs and

8    everything else.

9              Thanks a lot.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25